# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARKIS VARDANYAN,<br><br>                   Petitioner,<br><br>      v.<br><br>KRISTI NOEM, Secretary, U.S. Department of Homeland Security; PAMELA BONDI, U.S. Attorney General; FERETI SEMAIA, Warden of the Adelanto ICE Processing Center; ERNESTO SANTACRUZ JR., Field Office Director, ICE Enforcement and Removal Operations, Los Angeles Field Office,<br><br>                   Respondents. | Case No. 2:26-cv-02248-SPG-SP<br><br>**ORDER GRANTING PETITIONER'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [ECF NO. 5]** |

Before the Court is the Emergency Motion for Temporary Restraining Order and Preliminary Injunction, (ECF No. 5 ("Motion")), filed by Petitioner Sarkis Vardanyan ("Petitioner"). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion.

-1-

## I.    BACKGROUND

The following factual background is taken from Petitioner's Petition for Writ of Habeas Corpus, (ECF No. 1 ("Petition")), and from a declaration of Deportation Officer Saul Hernandez, submitted by Respondents in opposition to the Motion, (ECF No. 8-1 ("Hernandez Declaration")).  Where the facts are in dispute, the Court recounts both parties' accounts.

Petitioner is a 41-year-old man of Armenian ethnicity who immigrated to the United States from the Soviet Union in approximately June 1988.  (Petition ¶ 19).  Petitioner was four years old at the time of his immigration, and he entered the United States using his father's Soviet passport because he had no identification document of his own.  (*Id.* ¶ 20).  Following the collapse of the Soviet Union, Petitioner became stateless, and he is not currently a citizen of any country.  (*Id.* ¶ 14).  Petitioner grew up in the United States and has not resided in any other country as an adult.  (*Id.* ¶ 21).

While living in the United States, Petitioner has been convicted of multiple criminal offenses, including convictions for burglary in 2006, 2011, 2014, 2015, and 2016.  (Hernandez Decl. ¶¶ 4-6, 10-12, 15).  On February 3, 2012, Petitioner was arrested by ICE and served with a notice to appear for removal proceedings.  (*Id.* ¶ 7).  On March 7, 2012, an Immigration Judge ordered Petitioner removed to Armenia.  (*Id.* ¶ 8; Petition ¶ 22).  On June 6, 2012, ICE released Petitioner from its custody on an Order of Supervision ("OSUP"), with requirements to regularly report to ICE while ICE's request for a travel document was pending with the Armenian Consulate.  (Hernandez Decl. ¶ 9).  ICE has no record of ever receiving a response to its 2012 request.  (*Id.*).  On October 30, 2015, ICE revoked Petitioner's OSUP and took him into custody before again releasing him on OSUP on February 24, 2016.  (*Id.* ¶¶ 13-14).  The parties dispute whether Petitioner was subject to an additional period of ICE detention in 2020.  Petitioner alleges that he was detained in 2020 and held for four months before being released by ICE on OSUP.  (Petitioner ¶ 23).  By contrast, in his declaration, Deportation Officer Hernandez attests that Petitioner was

held for a single day on July 9, 2020, before being released by ICE on OSUP. (Hernandez Decl. ¶ 17).

Since 2020, Petitioner has complied with his OSUP requirements without any violations or new convictions. (Petition ¶ 23); *see* (Hernandez Decl.). In October 2025, ICE placed Petitioner under an additional Intensive Supervision Appearance Program ("ISAP"), requiring additional check-ins. (Petition ¶ 24). On December 10, 2025, Petitioner appeared for an OSUP check-in appointment and was detained by ICE. (*Id.* ¶ 25A).[1] ICE prepared a Notice of Revocation, which states that ICE reviewed Petitioner's case and determined that he would be kept in custody pursuant to 8 C.F.R. § 241.13 "on account of changed circumstances." (ECF No. 1-1). Specifically, the Notice states:

> ICE has determined that you can be expeditiously removed from the United States pursuant to the outstanding order of removal against you. On March 07, 2012, you were ordered removed by an immigration judge and you are subject to an administrative final order of removal. It is expected that you will be removed to Arminia [sic] in the foreseeable future.

(*Id.*).

The parties dispute whether Petitioner was timely provided a copy of the Notice. Petitioner alleges that the Notice was never served on him. (Petition ¶ 26A). Instead, Petitioner alleges that, after he was detained, his brother came to collect Petitioner's belongings and found the Notice. (*Id.* ¶ 25A). Petitioner alleges that the Notice was only prepared and given to Petitioner's brother after ICE had already detained him, and he states that he was not provided with any information about why his OSUP was revoked. (Petition ¶ 27A). In Deportation Officer Hernandez's account, ICE served the Notice on Petitioner during the check-in appointment and afforded Petitioner the opportunity for an informal interview, but he refused to participate. (Hernandez Decl. ¶ 18).

---

[1] The Petition includes multiple paragraphs labeled 25, 26, and 27. The Court will differentiate these by adding "A" and "B" to the first and second iterations of these paragraphs.

Hernandez further attests that Petitioner was scheduled for consular interviews on December 18 and December 30, 2025, but refused to cooperate. (*Id.* ¶¶ 19-20). On December 30, 2025, ICE sent a travel document request to the Armenian Consulate. (*Id.* ¶ 21). Hernandez states that ICE has successfully obtained travel documents for other similarly situated individuals, and that Petitioner's failure to cooperate is unlikely to deter the Armenian Consulate from issuing travel documents. (*Id.* ¶¶ 22-23).

Petitioner attests that he suffers from a serious, chronic, and medically volatile condition called Familial Mediterranean Fever ("FMF"), which causes sudden unpredictable attacks of high fever and severe abdominal pain, as well as weakness and systematic inflammation. (Petition ¶ 25B). Since being detained, Petitioner states that he has suffered four acute FMF episodes, none of which have been adequately treated. (*Id.*). On January 7, 2026, Petitioner's Counsel reached out to ICE and requested custody review, stating that, during his most recent episode, Petitioner was left lying in his cell for multiple days without meaningful medical intervention. (*Id.* ¶ 26B). ICE denied the request, stating that it was in the process of securing a travel document for Petitioner's removal. (*Id.* ¶ 27B). However, in subsequent communications, the Deportation Officer stated that he would inform the medical department of Petitioner's condition. (*Id.* ¶ 28).

Petitioner initiated this action on March 3, 2026, asserting violations of substantive due process, procedural due process, and ICE regulations governing the revocation of supervised release. (*Id.* at 8-13). Among other forms of relief, Petitioner requests an order of immediate release, an injunction prohibiting Respondents from re-detaining Petitioner absent a pre-deprivation hearing, and an order prohibiting Respondents from taking retaliatory action against Petitioner for the filing of this action. (*Id.* at 14).

Petitioner filed the instant Motion on March 17, 2026, seeking his immediate release and an injunction prohibiting Respondents from continuing to detain Petitioner. (Mot. at 13). Respondents filed an opposition to the Motion on March 20, 2026, (ECF No. 8 ("Opposition")), accompanied by the Hernandez Declaration and other supporting exhibits. Petitioner replied in support of the Motion on March 23, 2026. (ECF No. 9 ("Reply")).

## II.   LEGAL STANDARD

The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction.  *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical.") (citation omitted).  A plaintiff may secure a temporary restraining order upon establishing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Id.*  (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

In deciding an application for a temporary restraining order, the court is permitted to consider the parties' pleadings, as well as declarations, affidavits, and exhibits submitted in support of and in opposition to the application.  *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for a preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by the parties.") (citations omitted); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction); *BOKF, NA v. Estes*, 299 F. Supp. 3d 1117, 1122 (D. Nev. 2018).  "The trial

court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citations omitted). The urgency of the relief sought necessitates a prompt determination and can make it difficult to obtain admissible evidence. *Id.*

## III. DISCUSSION

### A. Likelihood of Success on the Merits

The Court notes that there are several outstanding factual disputes, including as to the length of Petitioner's detention in 2020 and as to whether ICE provided Petitioner with notice of the reasons for his OSUP revocation. However, for purposes of the instant Motion, the Court need not resolve these disputes. Even taking Respondents' account as true, Petitioner has shown a likelihood of success on the merits because he has been detained under 8 U.S.C. § 1231(a)(6) beyond the "presumptively reasonable period of detention" and has demonstrated that there is no significant likelihood of his removal in the reasonably foreseeable future. *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).

Under 8 U.S.C. § 1231(a)(1)(A), "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." During this 90-day removal period, the Attorney General is required to detain the alien for the purpose of effectuating the alien's removal. *Id.* § 1231(a)(2)(A). After this initial period, certain categories of removable aliens "may be detained beyond the removal period." *Id.* § 1231(a)(6). Although § 1231(a)(6) contains no specific limit on the length of permissible detention, because "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem," the Supreme Court in *Zadvydas* construed the statute "to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review." *Zadvydas*, 533 U.S. at 682, 690. During an initial six-month "presumptively reasonable period of detention," the Government may detain an individual under § 1231(a)(6) for purposes of effectuating removal. *Id.* at 701. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood

of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.*

Here, even discounting the disputed allegation that Petitioner was detained for an additional four months in 2020, Petitioner has been detained well beyond the presumptively reasonable six-month period recognized by the Supreme Court.  Deportation Officer Hernandez attests that Petitioner was first detained for a period of four months from February 3, 2012, to June 6, 2012.  (Hernandez Decl. ¶¶ 7-9).  Hernandez also attests to a subsequent period of detention from October 30, 2015, to February 24, 2016—nearly four months.  (*Id.* ¶¶ 13-14).  The parties also agree that Petitioner was re-detained on December 10, 2025, and remains in custody to date, adding more than three months to his detention period.  In total, this brings Petitioner's length of detention to more than eleven months.

While *Zadvydas* did not explicitly address whether multiple periods of detention can be aggregated to determine the applicable six-month period, most courts to address the question have found that release does not restart the six-month period.  *See, e.g.*, *Nguyen v. Scott*, 796 F. Supp. 3d 703, 722 (W.D. Wash. 2025); *Sied v. Nielsen*, No. 17-CV-06785-LB, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018); *Asfestani v. Current or Acting Field Off. Dir.*, No. 1:25-cv-1562-SCR, 2025 WL 3677321, at *4 (E.D. Cal. Dec. 18, 2025); *see also Siguenza v. Moniz*, No. 25-CV-11914-ADB, 2025 WL 2734704, at *3 (D. Mass. Sept. 25, 2025) (collecting cases across circuits).  The Court agrees with this approach.  Any contrary rule would effectively permit the Government to avoid the requirements of due process by executing a series of releases and re-detentions.  Because Petitioner has been detained more than six months in the aggregate, Petitioner's detention is outside the presumptively reasonable period recognized by the Supreme Court.

Because Petitioner has been detained beyond the presumptively reasonable period, Petitioner may contest his detention by showing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701.  Petitioner has made this showing.  Petitioner asserts, and Respondents do not contest, that Petitioner is stateless and does not possess citizenship in Armenia or any other

-7-

country. (Petition ¶ 28). This assertion is supported by Petitioner's attestation that he was born in the former Soviet Union and immigrated to the United States in 1988, before Armenia became a country. (*Id.* ¶ 19). Moreover, the record reflects that ICE has previously attempted to obtain travel documents for Petitioner on at least two occasions and has been unsuccessful. (Hernandez Decl. ¶¶ 9, 14). On at least one of those occasions, ICE did not even receive a response from the Armenian Consulate to its request for a travel document. (*Id.* ¶ 9). Thus, absent some policy change from the Armenian government, Petitioner is unlikely to be removed to Armenia in the reasonably foreseeable future.

Because Petitioner has made this initial showing, the burden shifts to the Government to provide "evidence sufficient to rebut" Petitioner's showing. *Zadvydas*, 533 U.S. at 701. The only evidence offered by the Government is Deportation Officer Hernandez's declaration that (1) ICE requested a travel document from Armenia on December 30, 2025; (2) ICE has successfully obtained travel documents for "other similarly situated individuals"; and (3) Petitioner's failure to cooperate is unlikely to deter the Armenian Consulate from issuing travel documents. (Hernandez Decl. ¶¶ 21-23). This evidence falls well short of the required showing. Respondents offer no reason to think that the current application for travel documents will be any different from previous attempts, all of which were unsuccessful. Respondents do not attest, for example, that they have cured some deficiency previously identified by the Armenian Consulate, nor do they identify any change in Armenian government policy as to repatriation of Soviet-era refugees. Respondents' bare assertion that "other similarly situated individuals" have received travel documents fails to grapple with Petitioner's status as a stateless noncitizen or the reasons for the Government's previous failed attempts to secure travel documents. *See Bui v. Noem*, No. 5:25-cv-03370-RGK-AJR, 2025 WL 4061564, at *3 (C.D. Cal. Dec. 30, 2025) ("[E]vidence that others have been removed, without a specific comparison to Petitioner's case, do little to show that Petitioner, himself, is likely to be removed in the reasonably foreseeable future."). Given the total length of Petitioner's detention and the multiple unsuccessful prior requests for travel documents, the Court is not persuaded that

merely applying for travel documents means that there is a "significant likelihood of removal in the reasonably foreseeable future." *See Zadvydas*, 533 U.S. at 701 (explaining that "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' [] would have to shrink"); *see also Nguyen*, 796 F. Supp. 3d at 725 (concluding that the fact that "there is at least some possibility" of removal "is not the same as a significant likelihood that he will be accepted in the reasonably foreseeable future").

Because Respondents have failed to rebut Petitioner's showing, the Court concludes that Petitioner is likely to succeed on the merits of his due process claim.

## B. Irreparable Harm

Next, the Court finds that Petitioner has established that he will suffer irreparable harm in the absence of a temporary restraining order. "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury," including those "imposed on anyone subject to immigration detention." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (citation omitted). As the Supreme Court has explained, "[t]he time spent in jail . . . has a detrimental impact on the individual," often resulting in the "loss of a job" and disruptions to "family life." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). Moreover, the Ninth Circuit has recognized the "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. Here, Petitioner has been unlawfully detained in violation of his due process rights, which, by itself, qualifies as irreparable harm. Moreover, Petitioner has put forth substantial evidence to support his claim that he suffers from a rare genetic illness for which is receiving inadequate medical care while in detention. *See* (ECF No. 5-2). Thus, Petitioner has suffered irreparable harm as a result of his detention and will continue to suffer the harm absent relief. As such, the second *Winter* factor weighs in Petitioner's favor.

## C.    Balance of Equities and Public Interest

When the Government is the party opposing the relief sought, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the Ninth Circuit has explained, "it is always in the public interest to prevent the violation of a party's constitutional rights," and "[t]he government also cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). Respondents argue that the balance of equities favor the Government because "[t]here is always a public interest in prompt execution of removal orders." (Opp. at 10 (quoting *Nken*, 556 U.S. at 435)). However, as discussed above, Respondents have not made an adequate showing that Petitioner's removal order is likely to be promptly executed. Given the Court's finding that Petitioner is likely to succeed on the merits of his due process claim, the Court concludes that Petitioner's deprivation of his constitutional rights outweighs any interest that Respondents may have.

On balance, the *Winter* factors weigh in Petitioner's favor. The Court therefore GRANTS Petitioner's Motion.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion and ORDERS as follows:

1.    Respondents are ORDERED to immediately release Petitioner from custody and restore him to the status quo prior to his re-detention by reinstating his prior order of supervision;

2.    Absent changed circumstances as to the likelihood of Petitioner's removal—such as the issuance of a travel document by the Armenian Consulate—Respondents are temporarily ENJOINED AND RESTRAINED from continuing to detain Petitioner pending adjudication of his Petition;

3.    Respondents are ORDERED TO SHOW CAUSE in writing no later than seven (7) days from the date of this Order why the Court should not issue a preliminary injunction. Petitioner may file a Reply no later than ten (10) days

from the date of this Order.  The Court sets a hearing on whether a preliminary injunction should issue for Wednesday, April 8, at 10:00 a.m.  The Court will accept a stipulated briefing schedule extending these dates on the condition that the parties agree to an extension of the TRO; and

4.  The Court waives the discretionary security bond contemplated by Federal Rule of Civil Procedure 65(c) because it is unlikely that the Government will incur any significant cost and requiring a bond "would have a negative impact on [Petitioner's] constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

**IT IS SO ORDERED.**

DATED:  March 26, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

-11-